Steven Sugarman
New Mexico Bar No. 5717
347 County Road 55A
Cerrillos, New Mexico 87010
(505) 672-5082
stevensugarman@hotmail.com
*pro hac vice* application pending

Attorney for WildEarth Guardians

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

TUCSON DIVISION

| | | |
|---|---|---|
| WILDEARTH GUARDIANS, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | No. _____ |
| vs. | ) | |
| | ) | |
| UNITED STATES FOREST SERVICE, | ) | **COMPLAINT FOR** |
| | ) | **DECLARATORY AND** |
|     Defendant. | ) | **INJUNCTIVE RELIEF** |
| | ) | |
| _____ | ) | |

## I.  Preliminary Statement

1.      The Mexican spotted owl was listed as a threatened species in need of the

protections afforded by the Endangered Species Act ("ESA") on March 16, 1993.  At the

time of listing, federal government biologists estimated that more than 90% of all

remaining Mexican spotted owls resided on national forest lands administered and

managed by Defendant United States Forest Service ("USFS").  The vast majority of

these owls were found on national forest lands in Arizona and New Mexico.

2.      The population of Mexican spotted owls has not rebounded since the species was

listed as a threatened species.  To the contrary, the most recent studies by federal

government biologists indicate that the species population has declined and continues to

decline.  Those biologists estimate that the population of Mexican spotted owls in New

Mexico is declining at the rate of approximately 6% annually, while the population in

Arizona appears to be stable but is not increasing.

3.      All USFS management activities on national forest lands are guided and

constrained by a Land and Resource Management Plan ("LRMP") which the USFS

develops for each national forest.  In 1996, the USFS amended the eleven LRMPs which

govern USFS management activities on Arizona and New Mexico national forests to

include specific management requirements – known as "Standards and Guidelines" – that

are intended to conserve and to recover Mexican spotted owl populations and habitats in

the national forests of the southwestern United States.  (The eleven national forests in

Arizona and New Mexico constitute the USFS's "Region 3.")

4.      All USFS management activities on national forest lands in Arizona and New

Mexico – such as timber harvest and livestock grazing – must be consistent and comply

with the provisions of the governing LRMP, including the 1996 Standards and

Guidelines.  16 U.S.C. §1604(i).

5.      Implementation of the eleven Region 3 LRMPs – as amended by the 1996 Mexican spotted owl Standards and Guidelines – through site-specific management activities is acknowledged by the USFS to have a potentially adverse effect on Mexican spotted owls and their designated critical habitat.  Accordingly, as required by ESA Section 7(a)(2), 16 U.S.C. §1536(a)(2), the USFS has engaged in "formal consultations" with Defendant United States Fish and Wildlife Service ("FWS") as to the effects of LRMP implementation on the Mexican spotted owl.  The most recent formal consultation culminated in the issuance of a Biological Opinion ("BO") by the FWS in June of 2005.

6.      All USFS management activities on national forest lands in Arizona and New Mexico must comply within the sideboards set by the 2005 BO in order to comply with the mandatory requirements of the ESA.

7.      Since 2005, the USFS has planned, authorized, and implemented projects that are inconsistent with critical factual assumptions underlying the 2005 BO, and has failed to comply with the mandatory "terms and conditions" of the ITS incorporated into the 2005 BO.  This course of action violates ESA Section 7, 16 U.S.C. §1536, and ESA Section 9, 16 U.S.C. §1538.

8.      The violations of the ESA described in the paragraph immediately preceding require the USFS to re-initiate and to conclude a new formal consultation with the FWS.

9.      While the USFS purports to have re-initiated a Section 7(a)(2) formal consultation with the FWS, it has failed to take the requisite steps to re-initiate such a formal consultation.

10.     In the alternative, even if the USFS has re-initiated a Section 7(a)(2) formal consultation with the FWS, it impermissibly continues to plan, authorize, and implement site-specific projects – including projects involving timber harvest activities – that have an "irreversible or irretrievable commitment of resources," as that phrase is used in ESA Section 7(d).

11.     Since the USFS has failed to comply with the mandatory "terms and conditions" of the ITS incorporated into the 2005 BO, all of the USFS's take of Mexican spotted owls is non-exempt and constitutes a violation of ESA Section 9.

12.     Accordingly, Plaintiff WildEarth Guardians brings this ESA citizens' suit against the USFS pursuant to 16 U.S.C. §1540(g)(1) in order to enforce the requirements of ESA Section 7 and ESA Section 9.

## II. **Parties**

13.     Plaintiff WildEarth Guardians is a non-profit corporation with approximately 4,500 members nation-wide.  In Arizona, WildEarth Guardians maintains offices in Tucson and Chandler.  WildEarth Guardians' mission is to protect and restore wildlife, wild places, and wild rivers in the American West.  WildEarth Guardians has an active endangered species protection campaign. As part of this campaign, WildEarth Guardians

actively participates in USFS planning and decision-making processes that have the potential to affect the Mexican spotted owl and its continued survival.  WildEarth Guardians' participation in this regard is in the form of public education and outreach, commenting on proposed USFS projects, and administrative appeals of USFS projects that have a possible adverse effect on the continued survival of the Mexican spotted owl. WildEarth Guardians has a long history of litigation with the USFS in connection with protection of the Mexican spotted owl.  Amongst other accomplishments, this litigation resulted in a court order requiring the USFS to comply with its mandatory duties under the ESA by engaging in a formal consultation with the FWS as to the biological effects of the USFS's implementation of the eleven LRMPs which guide and constrain USFS management activities on Arizona and New Mexico national forests.  Furthermore, WildEarth Guardians' members frequently recreate in the national forests of Arizona and New Mexico.  WildEarth Guardians' members enjoy viewing the Mexican spotted owl in its native habitat on national forest lands, and intend to continue their use and enjoyment of national forest lands for this purpose in the future.  WildEarth Guardians is injured by the USFS's failure to comply with the ESA in the manners set forth below. WildEarth Guardians and its members have a substantial interest in this matter and are adversely affected by the USFS's violations of the ESA.  The relief requested in this Complaint will redress WildEarth Guardians' and its members' injuries.

14.     Defendant USFS is a federal agency which manages the eleven national forests in USFS Region 3 in Arizona and New Mexico.  In its management of national forest lands, the USFS has a mandatory statutory and regulatory duty to comply with all relevant environmental laws, including the ESA.

## Jurisdiction and Venue

15.     The Court has jurisdiction over this action under 28 U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. §2201 (declaratory judgment), 28 U.S.C. §2202 (injunctive relief), 16 U.S.C. §1540(g)(1) (ESA citizen suit provision).

16.     As required by the ESA, WildEarth Guardians has provided the USFS with sixty days' notice of its intent to commence a citizen suit in connection with the USFS's ESA violations alleged in this complaint.  16 U.S.C. §1540(g).

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(e) because this is an action against agencies of the United States and because the cause of action arises in Arizona, and pursuant to 16 U.S.C. §1540(g)(3)(A) (ESA citizen suit provision).

18.     There exists now between the parties hereto an actual and justiciable controversy in which WildEarth Guardians is entitled to have a declaration of its rights and of the USFS's obligations and further relief because of the facts and circumstances hereafter set out.

## IV.  Facts

A.     The mandatory requirements of the Endangered Species Act

19.     The structure and function of the ESA, 16 U.S.C. §1531 *et seq.*, are premised on Congress's finding that the biggest threat to the continued survival of threatened and endangered wildlife species is the destruction of their natural habitats.  Accordingly, the ESA contains various provisions that are specifically intended to halt the trend of habitat destruction.

20.     The expressed purpose of the ESA is "to provide a program for the conservation [of] endangered species and threatened species" and "to provide a means whereby the ecosystems upon which [such] species depend may be conserved."  16 U.S.C. §1531(b).

21.     Pursuant to the ESA, the FWS has the duty to list imperiled species as threatened or endangered on the basis of biological criteria.  16 U.S.C. §1533(c).

22.     Once a species is listed for protection under the ESA, the FWS has an obligation to prepare a "Recovery Plan" for the species pursuant to ESA Section 4(f).  16 U.S.C. §1533(f).  The purpose of a Recovery Plan is to define those management constraints and actions that will promote the conservation and survival of listed species, and to develop criteria for the "delisting" of listed species.

23.     After a species is listed as threatened or endangered under the ESA, Section 7(a)(1) of the ESA imposes important obligations on federal agencies to "conserve" such species.  16 U.S.C. §1536(a)(1).  For purposes of ESA compliance, the duty to "conserve" requires that federal agencies use their authorities to assure the survival of threatened and

endangered species, to protect their critical habitats, and to promote the recovery of the species to the point at which they no longer require the protections of the ESA.

24.     Pursuant to Section 7(a)(2) of the ESA, 16 U.S.C. §1536(a)(2), federal agencies have a mandatory duty to "insure that any action . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the species' designated critical habitat.[1]

25.     In order to assure that federal agencies comply with their substantive Section 7(a)(1) duty to conserve and their substantive Section 7(a)(2) duty to insure against jeopardy or adverse modification of designated critical habitat, Section 7(a)(2) of the ESA mandates a "formal consultation" process which requires all federal agencies to consult with the FWS as to those projects that may adversely affect a listed species or may adversely modify designated critical habitat.  16 U.S.C. §1536(a)(2).[2]  The duties set out in Section 7(a)(2) are known as the "Section 7 procedural duties."

---

[1]

Hereafter in this Complaint, the statutory phrase "destruction or adverse modification" will be shorted to "adverse modification" or, when contextually appropriate, "adversely modify."

[2]

In the case of threatened and endangered maritime species, federal agencies conduct their Section 7 consultations with the National Marine Fisheries Service ("NMFS") instead of the FWS.

26.     The first step in the formal consultation process is a written request for the initiation of formal consultation from the action agency to the FWS.  16 U.S.C. §1536(c), 50 C.F.R. §402.14(c).

27.     The written initiation request from the action agency to the FWS must include a number of specifically identified items to assist the FWS in its analysis of the effects of the proposed action.  50 C.F.R. §402.14(c)(1)-(6).

28.     One of the items required to initiate a formal consultation is a Biological Assessment ("BA") prepared by the action agency in which the action agency assesses the expected impact of the proposed project on listed species and their designated critical habitats.  16 U.S.C. §1536(c), 50 C.F.R. §402.12.

29.     A formal consultation cannot be initiated unless and until the action agency prepares a BA and submits it to the FWS. 50 C.F.R. §402.12(j), 402.14(k).

30.     Furthermore, the action agency cannot approve or commence implementation of a project that may adversely affect listed species or adversely modify their designated critical habitats unless and until it prepares a BA for that project and submits the BA to the FWS.  16 U.S.C. §1536(c).

31.     The formal consultation process concludes with the issuance of a Biological Opinion ("BO") by the FWS.

32.     In the BOs that it issues at the conclusion of the formal consultation process, the FWS determines whether a proposed agency action comports with its Section 7

substantive duties.  If the FWS finds that a proposed agency action will jeopardize a listed species or adversely modify its designated critical habitat, the FWS formulates a "Reasonable and Prudent Alternative" ("RPA") which avoids that effect.

33.     During the course of the Section 7(a)(2) formal consultation process, an agency action is prohibited by ESA Section 7(d) from taking any action that would result in irreversible and irretrievable effects.  16 U.S.C. §1536(d).

34.     The Ninth Circuit Court of Appeals has determined that timber cutting activities on public lands "constitute *per se* irreversible and irretrievable commitments of resources under §7(d) and thus [cannot] go forward during the consultation period."  Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1056 (9th Cir. 1994), Lane County Audubon Society v. Jamison, 958 F.2d 290, 295 (9th Cir. 1992).

35.     Section 9 of the ESA and its implementing regulations prohibit any person, including any federal agency, from "taking" a threatened species.  See 16 U.S.C. §1538(a)(1); 50 C.F.R. §227.21.  Taking is defined broadly under the ESA to include harming, harassing, or killing a protected species either directly or by degrading its habitat sufficiently to significantly impair essential behavioral patterns.  See U.S.C. §1532(19); 50 C.F.R. §17.3.

36.     A federal agency may "take" a listed species incidental to an otherwise lawful activity only after obtaining an Incidental Take Statement ("ITS") from the FWS.  16 U.S.C. §1536(o).  The FWS incorporates an ITS into the BOs that it issues, if it finds that

implementation of the action that is the subject of a BO will result in the "incidental take"

of individuals of a listed species but that the level of anticipated incidental take will not

jeopardize a species' continued survival or recovery or adversely modify its designated

critical habitat.  16 U.S.C. §1536(b)(4).

37.     An ITS sets forth the amount of incidental take that is permitted, and that is

therefore exempt from the take prohibition of ESA Section 9.  Id.

38.     The FWS must specify in each ITS "those reasonable and prudent measures . . .

necessary or appropriate to minimize" the impact of the permitted incidental taking, as

well as mandatory non-discretionary "terms and conditions" that the action agency must

implement in order to comply with the defined "reasonable and prudent measure."  Id.

39.     If an agency exceeds the amount of incidental take allowed by an ITS, or does

not comply with the "terms and conditions" set forth in the ITS, then the agency has a

mandatory obligation to reinitiate formal consultation with the FWS.  50 C.F.R. §402.16.

40.     An action agency also has a mandatory duty to re-initiate formal consultation

pursuant to Section 7(a)(2) of the ESA if it modifies the action which is the subject of a

BO in such a way that implementation of the action may affect a listed species or its

designated critical habitat in a manner not addressed in the original BO.  Id.

41.     If an agency exceeds the amount of incidental take allowed by an ITS, or does

not comply with the "terms and conditions" set forth in the ITS, then the incidental take

associated with the agency's implementation of the project addressed by the BO is not exempt from the take prohibition of ESA Section 9.

B.     Mexican spotted owl listing, the Recovery Plan, and the 1996 Standards and Guidelines

42.     The Mexican spotted owl was listed as a threatened species requiring the protections of the Endangered Species Act on March 16, 1993.  58 Fed.Reg. 14248.

43.     In the final rule listing the Mexican spotted owl as a threatened species, the FWS cited "past, current, and future timber-harvest" practice of USFS Region 3 as one of "the primary factors leading to listing the Mexican spotted owl as a threatened species."

44.     In particular, the FWS identified a USFS timber management practice known as "shelterwood harvest" as the biggest threat to the continued survival of the Mexican spotted owl.  This practice – which was widely used in USFS Region 3 forests at the time of listing – produced even-aged stands of timber, rather than the un-even aged, multi-layered stands most often used by Mexican spotted owl for nesting and roosting.

45.     At the time of the listing of the Mexican spotted owl as a threatened species, the FWS determined that 91% of known Mexican spotted owls occurred on national forest lands administered by the USFS.  The vast majority of these owls resided on national forest lands within Arizona and New Mexico, in USFS Region 3.

46.     Because Mexican spotted owls are largely limited to national forest lands in Region 3, as discussed in the paragraph immediately preceding, the protection of Mexican

spotted owl populations and habitats on national forest lands in Region 3 is critical to the continued survival and recovery of the species.

47.    Since the Mexican spotted owl was listed as a threatened species, and despite promulgation of the timber harvest and other restrictions discussed below in this Complaint, populations of the species in Arizona and New Mexico appear not to have increased.

48.    Indeed, in a June 10, 2005 BO on the biological effects of continued implementation of the eleven Region 3 LRMPs, the FWS summarized the best available scientific evidence regarding Mexican spotted owl population dynamics: "In general, . . . results suggest that most populations studied either have declined slightly in the recent past or are still declining."

49.    Federal biologists' most recent post-listing estimates are that the population of Mexican spotted owls in New Mexico continued to decline at an annual rate of approximately 6%.

50.    As a result of the tenuous population dynamics of the species, the FWS has stated that "the MSO is . . . likely very vulnerable to actions that impact adult survival (e.g., habitat alteration, drought, etc.) during years of low recruitment."

51.    Pursuant to the requirements of ESA Section 4(f), 16 U.S.C. §1533(f), the FWS prepared a Recovery Plan for the Mexican spotted owl in December of 1995.  The core purposes of the Recovery Plan are to describe future management actions necessary for

the conservation and survival of the Mexican spotted owl and to establish "delisting criteria" which, when met, would support a determination that the Mexican spotted owl has recovered to the point that it no longer needs the protections afforded by the ESA.

52.     The FWS describes the core operating principle of the Recovery Plan as follows: "The Recovery Plan recommendations are a combination of (1) protection of both occupied habitats and unoccupied areas approaching characteristics of nesting habitat, and (2) implementation of ecosystem management within unoccupied but potential habitat."

53.     The Recovery Plan is clear that population and habitat monitoring of the Mexican spotted owl is key to the species' conservation and survival, and that the species should not be delisted unless and until an adequate monitoring program is implemented:

> Many of the ecosystem management guidelines provided in this Plan will provide a foundation for development of the long-term strategy. In formulating the recommendations, the Team assumes that population and habitat status will be monitored in conjunction with implementation of these management guidelines. Therefore, the management guidelines are not meant to stand alone. Monitoring provides objective criteria to assess the efficacies of the management guidelines. Without both habitat and population monitoring, the status of the owl cannot be assessed and it should not be delisted.

54.     In a similar vein, the Recovery Plan plan states that "[o]ur recommendations assume that population status and habitat condition will be monitored in conjunction with recovery efforts for the Mexican spotted owl" and that "[t]he management

Complaint - Page 14

recommendations [incorporated into the Recovery Plan] are not meant to stand alone without such monitoring."

55.     Accordingly, the Recovery Plan sets out a detailed protocol for the monitoring of Mexican spotted owl populations and Mexican spotted owl habitats.

56.     The delisting criteria incorporated into the Recovery Plan specifically contemplate that delisting of the Mexican spotted owl cannot and will not occur until the USFS implements the specific monitoring program for Mexican spotted owl populations and habitat described in detail in the Recovery Plan.

57.     As a result of the listing of the Mexican spotted owl as a threatened species, the USFS undertook a process to amend the eleven LRMPs which guide and constrain all USFS management actions on national forest lands in USFS Region 3.

58.     This effort culminated in the issuance of Standards and Guidelines which were incorporated into the Region 3 LRMPs by way of LRMP amendments in 1996.

59.     The overall goal of the 1996 Standards and Guidelines was to protect the conditions and structures used by the owls in occupied areas, and to set other areas on a trajectory of growth so that they may also provide nesting and foraging habitat for the Mexican spotted owl in the future.

60.     One of the primary intents of the 1996 Standards and Guidelines was to modify the USFS's timber harvest practices in Region 3 in order to assure the development of

uneven-aged forests containing older and larger trees than currently existed across the landscape in USFS Region 3.

61.     The core of the Mexican spotted owl conservation strategy contemplated by the 1996 Standards and Guidelines is the creation of 600 acre Protected Activity Centers – or "PACs" – that are created around each known Mexican spotted owl or pair of Mexican spotted owls.  Within PACs, future timber harvest activity was made subject to significant restrictions on the timing and the extent of permissible harvest.

62.     One of the most important restrictions on timber harvest in PACs prohibits all tree cutting except for cutting associated with fuelwood projects and fire risk abatement which can occur outside of a 100 acre "core area" which is drawn around a known Mexican spotted owl nest site within the PAC.  In connection with fuelwood projects and fire risk abatement in PACs but outside of the 100 acre core area, the 1996 Standards and Guidelines allow the cutting only of those trees that are less than 9 inches in diameter.

63.     The 1996 Standards and Guidelines incorporate additional restriction on timber harvest, snag removal, road construction, and other management activities in both PACs and in Restricted Areas (also sometimes known as Restricted Habitat), which are those areas that are suitable Mexican spotted owl habitat outside of designated PACs.

64.     The 1996 Standards and Guidelines incorporate measures intended to assure that the habitat effects of livestock grazing within the eleven Region 3 national forests are not inconsistent with the conservation and recovery of the Mexican spotted owl.

65.      The 1996 Standards and Guidelines also prescribed a detailed program for the

monitoring of Mexican spotted owl populations and habitats.  These monitoring

requirements track the proposed monitoring program that had been recommended and

described in detail by the FWS in its December 1995 Recovery Plan.

C.      <u>The FWS's Biological Opinions as to the biological effects of implementation of
        the 1996 Standards and Guidelines</u>

66.      The USFS acknowledges that its management activities on national forests

within USFS Region 3 – even as constrained by the mandatory implementation of the

1996 Standards and Guidelines – may adversely affect Mexican spotted owls and/or

adversely modify or destroy designated critical habitat.  Accordingly, the USFS initiated a

formal consultation with the FWS as to the biological effects of its management activities

on the Mexican spotted owl pursuant to the requirements of ESA Section 7(a)(2).

67.      On November 25, 1996, the Fish and Wildlife Service issued a BO as to the

expected effects of implementation of the eleven Region 3 LRMPs, as amended by the

1996 Standards and Guidelines.

68.      The 1996 BO concluded that implementation of the Region 3 LRMPs – as

amended by the incorporation of the 1996 Standards and Guidelines – would not

jeopardize the Mexican spotted owl or adversely modify the species' critical habitat, but

would result in "incidental take" of Mexican spotted owls.

69.     Accordingly, the 1996 BO incorporated an ITS that authorized the USFS to "take" a limited number of Mexican spotted owls.

70.     As required by the ESA, the ITS included a number of "reasonable and prudent measures" ("RPMs") which the USFS was obligated to implement in order to "shield" the expected incidental take from the taking prohibition of ESA Section 9.  The ITS further set forth a number of non-discretionary "terms and conditions" which the USFS was required to implement in order to achieve the objectives of the RPMs.

71.     Included within those non-discretionary "terms and conditions" was implementation of the population and habitat monitoring program proposed by the FWS in the December 1995 Recovery Plan.

72.     As explained above, the USFS had previously committed to implementation of the proposed monitoring program when it incorporated that monitoring program into the 1996 Standards and Guidelines.

73.     By the mid-2000s, it became apparent that USFS management activities had resulted in an amount of incidental take of Mexican spotted owls that exceeded the amount of incidental take authorized by the ITS of the 1996 BO.

74.     Additionally, by the mid-2000s it became apparent that the USFS had not implemented the monitoring program that was required by the ITS incorporated into the 1996 BO and also required by the 1996 Standards and Guidelines.

75.     Accordingly, as required by the ESA, the USFS re-initiated its formal consultation with the USFS as to the effects on the Mexican spotted owl of the continuing implementation of the eleven Region 3 LRMPs, as amended by the 1996 Standards and Guidelines.[3]

76.     The FWS issued a new BO as to the effects of continued implementation of the eleven Region 3 LRMPS, as amended by the 1996 Standards and Guidelines, on June 10, 2005.

77.     In preparing the 2005 BO, the FWS relied on two core assumptions regarding the USFS's compliance with the 1996 Standards and Guidelines.  First, the FWS's June 2005 BO assumes that "[s]ite-specific projects will conform to the [1996 Standards and Guidelines], as well as the programmatic framework established in the LRMPs."  Second, the FWS's June 2005 BO assumes that USFS "[l]and managers use and/or implement the [1996 Standards and Guidelines] at every level of planning (i.e. forest-wide, management areas, and project level)."

78.     Like the 1996 BO, the 2005 BO concluded that continued implementation of the eleven LRMPs in USFS Region 3 was reasonably certain to result in the "incidental take" of Mexican spotted owls.  Accordingly, the BO includes an ITS that provides the USFS with an exemption from the ESA Section 9 "take prohibition."

---

[3]

        The re-initiated consultation also assessed the biological effects of LRMP implementation on other  ESA-listed species.

79.     The ITS incorporated into the 2005 BO contains three mandatory RPMs that the USFS must adhere to in its management of national forest lands in USFS Region 3: (1) protect Mexican spotted owls on national forest lands, (2) protect Mexican spotted owl habitat on national forest lands, and (3) monitor Mexican spotted owl occupancy on national forest lands pursuant to the December 1995 Recovery Plan.

80.     Each of the RPMs is associated with one or more non-discretionary "terms and conditions" that the USFS must implement in order for its expected incidental take of Mexican spotted owls to be exempted from the "take prohibition" of ESA Section 9.

81.     The first two of the three RPMs set out above – requiring the protection of Mexican spotted owls and Mexican spotted owl habitats on national forest lands – are associated with non-discretionary "terms and conditions" which require the USFS to design its management activities so that they "minimize or eliminate adverse effects to the Mexican spotted owl" and "have beneficial, insignificant, or discountable effects within occupied Mexican spotted owl habitat."

82.     The third of the three RPMs – requiring the monitoring of Mexican spotted owl populations and habitats pursuant to the protocols developed in the FWS's 1995 Recovery Plan – is associated with two non-discretionary "terms and conditions."  The first non-discretionary "term and condition" requires the USFS to monitor Mexican spotted owl PAC occupancy pursuant to the protocol of the December 1995 Recovery Plan in order to assess changes in owl site occupancy rates so that management actions can be adjusted if

changes in owl population occur."  The second non-discretionary "term and condition"

requires the USFS to "track and report" the effects of USFS management activities on

Mexican spotted owls in order "to assess when the amount or extent of take is being

approached" and in order "to make adaptive management changes for reducing adverse

effects of the proposed action [i.e., implementation of the eleven Region 3 LRMPs, as

amended by the 1996 Standards and Guidelines] to the Mexican spotted owl."

D.      The USFS's implementation of the LRMPs is inconsistent with the assumptions
        underlying the 2005 BO

83.     As set out above, the FWS's June 2005 BO is based on two critical assumptions

regarding the USFS's adherence to the 1996 Standards and Guidelines in its design and

approval of site-specific forest management activities and in its landscape level

management of Region 3 national forests.

84.     These assumptions have proved invalid at both the site-specific and at the

landscape level.

85.     Insofar as the site-specific level is concerned, the USFS continues to plan,

authorize, and implement projects that do not comply with the 1996 Standards and

Guidelines' management restrictions.

86.     For example, the USFS has issued a Final Environmental Impact Statement for

the Pinaleno Ecosystem Restoration Project on the Coronado National Forest in Arizona.

Plans for this project call for timber harvest activities within PACs and Restricted Areas

that are inconsistent with the timber harvest restrictions of the 1996 Region 3 LRMP amendments.

87.     As another example, the USFS has authorized the Phase II Utility Maintenance Project in Arizona national forests.  In connection with the project, the FWS has determined that "it is reasonably certain that trees greater than nine inches dbh [diameter at breast height] will be removed . . . within PACs."  This aspect of the project is inconsistent with and violates the 1996 Standards and Guidelines.

88.     As yet another example, the USFS has authorized the Perk-Grindstone Fuel Reduction Project in the Lincoln National Forest in New Mexico.  This project also calls for timber harvest activities that are inconsistent with the timber harvest restrictions of the 1996 Region 3 LRMP amendments.

89.     Since the 2005 BO was issued, the USFS has also planned and authorized grazing activities on national forest lands that are inconsistent with the standards and guidelines of the 1996 Region 3 LRMP amendments.

90.     Insofar as the invalidity of the 2005 BO's landscape level assumptions is concerned, the USFS has failed to implement the monitoring requirements of the 1996 Standards and Guidelines.

91.     The 1996 Standards and Guidelines incorporate both rangewide monitoring requirements which apply throughout Region 3, and specific monitoring requirements which apply to the national forest areas that contain the largest and most critical

populations of Mexican spotted owls.  The USFS has failed to implement all of these monitoring requirements.

92.     Consequently, the FWS's critical assumptions underlying the analysis in the 2005 BO – that USFS's management of Region 3 national forests would comply with the 1996 Standards and Guidelines at both the site-specific and landscape levels – are invalid. The invalidity of these assumptions vitiates the analysis and conclusions of the 2005 BO, and triggers a mandatory duty on the part of the USFS to re-initiate formal consultation pursuant to ESA Section 7(a)(2) as to the effects of the continued implementation of the eleven Region 3 LRMPs on Mexican spotted owls.

E.      The USFS has failed to comply with the non-discretionary "terms and conditions" of the 2005 BO

93.     As discussed above, the 2005 BO imposes non-discretionary "terms and conditions" on the USFS in connection with its management of the eleven Region 3 national forests.  Two of these "terms and conditions" implement the USFS's mandatory duty – imposed by the June 2005 BO to "[m]onitor Mexican Spotted Owl occupancy on National Forest System lands, pursuant to the most current approved Mexican Spotted Owl Recovery Plan."

94.     The USFS has failed to comply with the two non-discretionary "terms and conditions" that are associated with the monitoring requirement of the 2005 BO.

95.     Indeed, in some instances the USFS authorizes management activities despite the fact that it has no monitoring information whatsoever in the project area.

96.     For example, the USFS authorized livestock grazing on the 23,085 acre Wildbunch Allotment in the Apache-Sitgreaves National Forest of Arizona in the complete absence of monitoring information, despite the fact that both the USFS and the FWS acknowledge that such grazing may adversely affect the Mexican spotted owl.  With respect to the USFS's approval of the Wildbunch Allotment Management Plan, the FWS states that since "no surveys have been completed for Mexican spotted owls on the Wildbunch allotments, the exact number of owls potentially inhabiting these areas is unknown" and that "the project does not meet the guidance of the Recovery Plan." Consequently, the FWS states that "we are not able to conclude with reasonable certainty where owls are present and how they might be incidentally taken."

97.     The USFS has also failed to comply with the "terms and conditions" that implement the first two RPMs.

98.     The USFS acknowledges that it is not in compliance with the "terms and conditions" of the 2005 BO.

99.     For example, in the USFS's March 2008 Annual Report the agency states that "[m]ost Forests have indicated that personnel and funding levels are not adequate to meet the monitoring requirements set out in Term and Condition 3.1.  In many cases, monitoring has either not been accomplished or it has come at the expense of habitat

restoration or other management actions that could be accomplished to recover the species."

100.     Likewise, in an intra-USFS memo of September 17, 2009 – written by USFS biologists and directed to USFS Region 3's Regional Forester – the USFS admits that "[t]he FS has determined that it is unable to comply fully with the monitoring Reasonable and Prudent Measure (RMP) contained within the BO."

101.     Similarly, in a letter of April 17, 2009, the USFS admits to the FWS that it has not complied with the non-discretionary "term and condition" requiring PAC monitoring in accordance with the December 1995 Recovery Plan protocol.  The USFS wrote in that letter: "[I]t has become apparent that the Forest Service is unable to fully implement and comply with the monitoring requirements associated with the Reasonable and Prudent Measures for several species (including the MSO) in the BO."

102.     The USFS's failure to implement the non-discretionary "terms and conditions" of the ITS incorporated into the 2005 BO – including the monitoring "terms and conditions" has two significant legal consequences.

103.     First, the failure voids the operation of the June 2005 BO's ITS.  Accordingly, all take of Mexican spotted owls that occurs in connection with the USFS's management of Region 3 national forests is non-exempt and violates the ESA Section 9 take prohibition.

104.     Second, the failure triggers a mandatory duty on the part of the USFS to re-initiate formal consultation pursuant to ESA Section 7(a)(2) as to the effects of the continued implementation of the eleven Region 3 LRMPs on Mexican spotted owls.

F.     The purported re-initiation of formal consultation as to the Mexican spotted owl

105.     In the April 17, 2009 letter from the USFS to the FWS referenced above, the USFS requested re-initiation of Section 7(a)(2) formal consultation as to the effects of continued LRMP implementation in the Region 3 national forests.  The USFS provided two reasons for this request: (1) the likelihood of exceeding the amount of authorized incidental take for the Mexican spotted owl and (2) the USFS's inability to meet the monitoring "terms and conditions" of the 2005 BO's incorporated ITS.

106.     However, on March 3, 2010 a FWS employee informed one of Plaintiff's employees that the USFS and the USFWS had determined that re-initiation of the Section 7(a)(2) formal consultation was not needed and that the USFS's re-initiation request would be withdrawn.  The FWS employee informed Plaintiff's employee that the USFS's acknowledged inability to comply with the monitoring "terms and conditions" of the 2005 BO's ITS would be addressed in a future amendment to the Mexican spotted owl Recovery Plan.

107.     In an apparent change of heart, the FWS wrote to the USFS on June 22, 2010 and stated that "[w]e have recently received new information and agree that re-initiation of

Complaint - Page 26

the BO for the MSO is warranted at this time" and that "[w]e accept your request to re-initiate the 2005 BO to address the effects of forest management to the MSO."

108.     The June 22, 2010 letter referenced in the paragraph immediately preceding notes that the USFS is "beginning the process of preparing an amended Biological Assessment to address the re-initiation issue."

109.     In the fifteen months since its letter of April 17, 2009 – in which the USFS purported to request re-initiation of formal consultation as to the effects of continued implementation of the eleven Region 3 LRMPs on Mexican spotted owls and the species' habitat – the USFS has not prepared an amended BA or submitted an amended BA to the FWS.

110.     As noted above, the formal consultation cannot be re-initiated until such time as the amended BA is prepared and submitted to the FWS.  50 C.F.R. §§402.12(j), 402.14(c).

111.     In an intra-USFS memo written by USFS biologists on September 17, 2009 (at which time there appeared to be on-going discussions within and between the USFS and the FWS as to whether or not a re-initiation of formal consultation was required), USFS biologists wrote that national forest management activities in Region 3 "will not make any irreversible or irretrievable commitments of resources as they affect species."  This statement is inconsistent with decisions of the Ninth Circuit Court of Appeal which hold

that activities involving tree cutting *per se* irreversibly and irretrievably commit resources.

## V. Claims for Relief

First Claim for Relief
USFS Violation of 16 U.S.C. §1536(a)(1)
(Section 7 substantive duty)

112.     WildEarth Guardians incorporates by reference all preceding paragraphs.

113.     In connection with its administration and management of the eleven Region 3 national forests in Arizona and New Mexico, the USFS fails to exercise its discretion in a manner that conserves threatened and endangered species.

114.     The USFS's administration and management of the eleven Region 3 national forests in Arizona and New Mexico does not assure the survival of the Mexican spotted owl, does not protect the Mexican spotted owl's designated critical habitat, and does not promote the recovery of the Mexican spotted owl, and therefore violates the ESA.

Second Claim for Relief
USFS Violation of 16 U.S.C. §1536(a)(2)
(Section 7 substantive duty)

115.     WildEarth Guardians incorporates by reference all preceding paragraphs.

116.     Since the USFS is proceeding to plan, authorize, and implement management activities that may affect Mexican spotted owls or adversely modify critical habitat before the commencement and completion of the required re-initiated formal consultation, the USFS is violating its substantive duty to insure that its management of the Region 3

national forests does not jeopardize the Mexican spotted owl or adversely modify its

designated critical habitat.

Third Claim for Relief
USFS Violation of 16 U.S.C. §1536(a)(2)
(Section 7 procedural duty)

117.    WildEarth Guardians incorporates by reference all preceding paragraphs.

118.    The USFS exercises discretionary control over its administration and

management of the eleven Region 3 national forests in Arizona and New Mexico in ways

that adversely affect the Mexican spotted owl and and that adversely modify and/or

destroy the Mexican spotted owl's designated critical habitats.

119.    The USFS's departure from the critical assumptions that underlie the analysis

and the conclusions of the FWS's June 2005 BO renders those assumptions invalid, and

triggers a mandatory duty on the part of the USFS to re-initiate and to conclude a Section

7(a)(2) formal consultation with the FWS.

120.    The USFS's admitted failure to comply with the "terms and conditions" of the

ITS incorporated into the June 2005 BO – including the monitoring "terms and

conditions" – triggers a mandatory duty on the part of the USFS to re-initiate and to

conclude a Section 7(a)(2) formal consultation with the FWS.

121.    While the USFS purports to have commenced a re-initiated formal consultation

with the FWS, such re-initiated formal consultation cannot commence until the USFS

prepares and submits an amended BA to the FWS.

122.     The USFS's failure to commence a re-initiated formal consultation with the FWS

under these circumstances constitutes a violation of the ESA.

Fourth Claim for Relief
USFS Violation of 16 U.S.C. §1536(c)
(Section 7 hybrid substantive and procedural duty)

123.     WildEarth Guardians incorporates by reference all preceding paragraphs.

124.     The USFS may not authorize or implement any projects that may adversely affect

the Mexican spotted owl or that may adversely modify the species' designated critical

habitat until the USFS submits an amended BA to the FWS.  16 U.S.C. §1536(c).

125.     The USFS's continuing planning, authorization, and implementation of such

projects constitutes a violation of the ESA.

Fifth Claim for Relief
USFS Violation of 16 U.S.C. §1536(d)
(Section 7 hybrid substantive and procedural duty)

126.     WildEarth Guardians incorporates by reference all preceding paragraphs.

127.     As explained above, WildEarth Guardians alleges in this case that the USFS has

not commenced a re-initiated formal consultation with the FWS because it has failed to

prepare and to submit an amended BA.

128.     However, in the event that the Court determines that the USFS has properly

commenced a re-initiated formal consultation with the FWS, the USFS may not authorize

or implement any forest management activities associated with an irreversible and

irretrievable commitment of resources pending completion of that formal consultation.

16 U.S.C. §1536(d).  The USFS's continuing authorization and implementation of such activities constitutes a violation of the ESA.

<u>Sixth Claim for Relief</u>
USFS Violation of 16 U.S.C. §1538
(Section 9 take prohibition)

129.     WildEarth Guardians incorporates by reference all preceding paragraphs.

130.     The USFS's failure to implement the non-discretionary "terms and conditions" of the ITS incorporated into the 2005 BO – including the monitoring "terms and conditions" – voids the validity and the operation of the incorporated ITS which exempted the incidental take of Mexican spotted owls from the take prohibition of ESA Section 9.  Accordingly, all USFS management activities in Region 3 that result in the take of Mexican spotted owls violate Section 9.

## VI.  **Relief Requested**

WHEREFORE, WildEarth Guardians respectfully requests the following relief:

1.     An order declaring that the USFS is in violation of its substantive duties under the ESA.

2.     An order declaring that the USFS is in violation of its procedural duties under the ESA.

3.     An order declaring that the USFS is in violation of the take prohibition of Section 9 of the ESA

4.      An order enjoining the USFS to re-initiate and to complete a Section 7(a)(2) formal consultation as to the effects of the USFS's continued implementation of the eleven Region 3 LRMPs on Mexican spotted owls and the species' designated critical habitat.

5.      An order enjoining the USFS from authorizing and/or implementing any site-specific management activities that may adversely affect the Mexican spotted owl and/or adversely modify or destroy the species' designated critical habitat until such time as the USFS prepares and submits an amended BA to the FWS and re-initiates a formal consultation with the FWS.

6.      In the event that the court finds that the USFS has commenced a re-initiated formal consultation with the FWS – which Plaintiff WildEarth Guardians disputes – an order enjoining the USFS from authorizing and/or implementing any site-specific management activities that are associated with irreversible and irretrievable effects until such time as the USFS completes the re-initiated formal consultation as to the effects of the USFS's continued implementation of the eleven Region 3 LRMPs on Mexican spotted owls and the species' designated critical habitat.

7.      An order enjoining the USFS from authorizing and/or implementing any forest management activities associated with the "incidental take" of Mexican spotted owls unless and until the FWS issues a new and valid ITS to exempt that "incidental take" from the take prohibition of Section 9.

8.      An order awarding WildEarth Guardians its reasonable costs in this action,

including attorney's fees.

9.      Such other relief as this Court determines is just and proper.


Dated:  June 23, 2010                        Respectfully submitted,

                                               /s/ Steven Sugarman

                                             Steven Sugarman
                                             347 County Road 55A
                                             Cerrillos, New Mexico 87010
                                             Telephone:  (505) 672-5082